Good morning and may it please the court. The question on this appeal is whether the record contains sufficient evidence from which a reasonable jury could conclude that plaintiffs have proven each element of a fraud claim. But instead of engaging in that analysis, the district court actually made a determination as to what version of the fact it preferred, and in doing so, the court exceeded its role on summary judgment motion and usurped the role of the jury. Let me start first with the two Magnetar deals, Octant and Sagittarius, and talk about the misrepresentations. The record shows the defendant represented in term sheets and marketing books for both deals, that the collateral manager would select the collateral assets for the deals in order to maximize returns and minimize losses for the long investors. The offering circles for both deals also stated that the success of the deals would be highly dependent on the expertise and skills of the collateral managers. As we said in the brief, the defendants don't contest none of the materials or any other materials provided by Orkovia du Plaintiffs, so much is hinted that these deals were conceived by, planned, and executed by Magnetar. The offering circles were to IKB, not to the plaintiffs, is that correct? The offering circles were provided to IKB, that is correct, but representation in those... Hold on, and they were never transferred from IKB to the plaintiffs? That is not correct. Drafts of the offering circles were... Sorry, let me repeat it, sorry. You are correct. They were never transferred to the plaintiffs, but there were recommendations made and statements that were passed on from the defendants, from the offering circlers, through IKB to the plaintiffs. But doesn't New York law, after several certifications by our court, make sufficiently clear that in the circumstances of this case, I'm not saying in every case where there might be more specific intent of different sorts, that where you have an intermediary like IKB who has been given the misinformation, let's just say about the strongest case, that's Longshore, that even there where it is given to this intermediary, that does not amount to an action by the ultimate recipient. And after several certifications to New York on situations like this, isn't that fairly clear? I believe that it's not correct. I believe the law in New York is that in order to assert a claim for fraud where information was given to intermediary, all you have to show is that the plaintiff received the information from someone who received it from the defendant, and the defendant intended the misrepresentation to be conveyed to the plaintiff. Judge Coulter, you ruled that way in IB Trading versus TriPoint Global Equities, F sub 3, third 524. And that is the law, and that's exactly what happened here. The statement... But are you saying the recommendation from IKB to the plaintiffs is the same thing as the offering materials that were offered from Wells Fargo, Wachovia to IKB? When it comes to the misrepresentation... They didn't simply pass along the materials, right? They made a recommendation. That's correct. When it comes to the misrepresentation that we are suing on, it is the same thing, because the misrepresentation we're suing on is that the collateral manager would select the collateral, and the omission that of the material. That misrepresentation was made to IKB, and IKB, in its recommendation, the first thing it talked about is who is the collateral manager? What is the collateral manager doing? What is the record of the collateral manager? And it did not mention Magbatar, because there was no mention of Magbatar. It's precise... IKB made its recommendations after it did its own due diligence. It didn't simply pass on as a conduit the materials that it received from Wachovia. Isn't that fair? It made its own analysis on certain things, but when it comes to the identity of who is selecting the collateral, that is a straight conduit of that representation. They were told that Harding would be selecting the collateral in Auctions, and that SAI would be selecting it in Auctions. I don't believe that answers Judge Menashe's question. The question is, was that a decision done by IKB on its own? But I have another question, and that is, where you have parties that are all sophisticated, as these are, and where every time anything was asked was given, in fact, to the parties who asked, was there appropriate reliance? There was reliance, Your Honor, because my client relied on the fact that there would be a collateral manager in place who would be selecting to maximize returns. My client had no idea of Magnetar's involvement. He could not have known about Magnetar's involvement. Even the portfolio manager for SAI, James Burke, testified that he was shocked when he learned afterwards that Magnetar was, in fact, shorting the collateral and was a net short investor. My client had no idea, and they just relied on this, believing this was a normal CBO with returns, as was represented in the material. Can you show that Magnetar actually was making the choices? Isn't it the most you could show that Magnetar was making suggestions, and then Harding and SAI were perhaps influenced by those suggestions, but then exercised their own judgment? Well, I think that is a question for the jury. What we can show is that there is a real genuine dispute as to that. Take Sagittarius, for example. We have a situation where Magnetar suggested two bonds. James Burke rejects them, and then all hell breaks loose. We have all the emails on pages 36 and 37 of our brief, I believe. People in Wachovia who were indebted to Magnetar because Magnetar was the biggest client were saying, ìBurke has to be put on a leash. He needs an attitude adjustment.î He gets called in for lunch with the head of the whole group, and afterwards, he says, ìOkay, Iíll accept those bonds.î Now, here is the position. He says, ìI got comfortable with it.î But surely, thatís a matter for the jury to decide whether he was really comfortable with it or whether he was pressured into it. We know with Longshore that Mr. Burke was forced to do certain things that he considered to be unethical. He said that to his wife. We think the record is ample here that Magnetar made both collateral managers choose assets they were not comfortable with. In Octans, some of the assets that ended up in the Octans portfolio were in the list of rejected assets by Octans. One of the CDOs that went into the CDO bucket, specifically so that Magnetar could short it, Carina, was rejected by Harding, and Wachovia traders joked about it, calling it Katrina, likening it to the hurricane. We believe thereís a lot here in the record. I understand that Judge Crotty relied on kind of litigation, self-serving testimony by these collateral managers saying, ìWe did everything right. We donít recall the details, but we always applied our own analysis.î But there is a lot in this voluminous record, a lot of emails that suggested doubt here, and it wasnít for Judge Crotty to make the determination. It is for a jury to make the determination. So your argument is that Wachovia is bringing pressure to bear because they want to follow the Magnetar suggestions, but not that Magnetar is actually exercising the control, right? Well, in that example I gave, it was Wachovia. It was Magnetar trying to get James Burke to do the trade. He rejected it, so Magnetar called Wachovia, and the pressure came to Wachovia. There are other examples where Magnetar directly put pressure on the collateral managers. For example, Magnetar said, ìYou have to choose bonds. There has to be a $200 million ABS index asset, and you need to choose from this particular subset of assets.î Thatís what they said. They said in the email, ìThatís our deal, and thatís the way we do it.î So there are a lot of examples in the record of pressure, both directly by Magnetar, but because Magnetar had this connection with Wachovia, it was able to influence Wachovia to influence SAI and Sagittarius. So the disclosure would not have been that Magnetar is exercising control, but that Magnetar has a lot of influence over Wachovia, and Wachovia is putting pressure on the collateral managers. Yes. The correct disclosure should have been that a party that has a net short interest has got the ability to influence the collateral manager, and in fact, this particular CBO was created by this short investor as a vehicle for it to carry out its investment. It was a reverse inquiry deal. Magnetar called Wachovia and said, ìLetís do this deal so that we can be the equity investor,î and later on, Wachovia found out that they did it so that they that Harding and SAI are making decisions was untrue. They should have disclosed that Magnetar was out there having undue influence on the parent company that could then influence the behavior of the collateral managers. On the parent company in the case of Sagittarius, on Harding directly in the case of Optum. The trial court in New York in Lorelei against Merrill Lynch recently said, under what appeared to be very similar circumstances, no reliance, no loss causation. Do you think that that decision was simply wrong, or is there some way to distinguish it? I do believe that the decision was wrong, and the appeal on that was argued two weeks ago, I believe. The decision was wrong on both parts. Iíve already addressed reasonable reliance. Maybe I can quickly address the loss causation issue because I know thatís an important issue for this court. On loss causation, this is not a federal securities law fraud case. This is a Merrill Lynch versus Allegheny case, which follows the established rule that fraud damages are the difference between the purchase price of the asset and its true value as of the date of sale. As of the date of that sale, Lorelei suffered a loss as calculated by Dr. Neuberger, our expert, which is the difference between the value of the security and the price of it. Did the court below, in this case, make a finding as to loss causation? It did not. It essentially ruled that it doesnít have to. So if we were to decide for you on the other issues, we would properly send it back to the district court to decide loss causation. Loss causation is not an easy concept. Itís related to causal link in the ordinary tort things. Iíve written a fair amount about that. If the district court hasnít addressed it, I donít see how we should address it in the first instance. Thatís fine, Your Honor. I can leave it to the district court. Didnít the district court say no loss causation? It wasnít a long discussion. It was mainly driven by the fact that they found no misrepresentation and itís hard to see whether the district court actually considered the argument we made on loss causation under Allegheny. As Judge Coulter found in the AIG Global Lending Corp case that Allegheny applies to any liquid asset-backed security such as this one as opposed to the Dura line of cases. So itís not really clear, but I know that this court addressed it on the motion to dismiss when the case was before it a few years ago. But the district court said plaintiffs cannot establish loss causation since they cannot prove any misrepresentation caused their losses. And they cited basis, the district court cited basis, which plainly in a securities case, New York State Supreme Court Appellate Division held no loss causation because the loss would have been suffered to the CDO under any circumstances. So that appears to be what the district court said. Well, in the basis decision, the plaintiffs did not seek or argue that the Allegheny measure of out-of-pocket damages applies, which is the rule in this court and is what Judge Coulter applied in federal court for a securities case. And the expert in basis didnít provide any expert evidence in support of such a measure of damages. Donít we find persuasive decisions from the Appellate Division of the New York State Supreme Court? Sure, Your Honor. But that question wasnít precisely before the court in that case because nobody argued out-of-pocket damages. Iím not saying you should ignore basis, Iím just distinguishing it. But I think that the other thing thatís important here is this courtís own decision, and when this case was before it, you gave the example of the Lincoln House, the house that was sold being called the February Lincoln House, and then the flood came and destroyed it. Look, I wrote that opinion, and I believe, frankly, it does not look to me as if there was loss in what New York has reaffirmed on this. But Iím not sure that we ever get to that. It might not, Your Honor, but what you wrote in that decision is that if the buyer paid a premium for Lincoln House, that premium, the amount above the fair market value, is a separate harm from any consequential damages. And that is the theory of damages here. We paid a premium, and our experts calculated it based on the difference in ratings. We had a rating expert whose opinion was accepted by the court below that these securities would have been rated very differently had the conflict of interest been disclosed. And that rating difference has an effect on price of at least $54 million, and that is similar toÖ Okay, I think we have that argument. Can I just clarify two things? One is just the Lorelei. Even though IKB created the Lorelei entities, youíre not disputing that theyíre two separate entities, and so a misrepresentation that goes to IKB is not the same thing as a misrepresentation that goes to Lorelei, right? That is correct. Iím not disputing theyíre separate entities, but I am arguing that the information wasÖ IKB was the conduit for the misrepresentation, and the documents in the case, the record in the case, show that Wachovia was aware that the information that it was giving to IKB would beÖ No, I get that argument. I just wanted to clarify. And then you just described a conflict of interest being disclosed, but this, as you said a moment ago, is a fraud claim. I mean, the question is whether thereís a misrepresentation. You donít say that Harding and SAI were fiduciaries with potential investors and had special disclosure obligations, right? The question is whether the representations they made were false. That is correct. Iím saying that the interests made those representations false, so the reasons I expressed earlier, they had to disclose magnetized, heavy involvement, arduous influence, and instructions to Harding and to SAI in what assets to select. Thank you. Okay. Well, youíve reserved time for rebuttal, so unless my colleagues have further questions, weíll hear from you again, but letís turn to the Jay Tambay from Jones Bay for the appellees. The decision below should be affirmed. There was a theory of the case and allegations and snippets from emails that were sufficient to get this complaint passed, the motion to dismiss. Years of discovery, depositions, documents produced, have yielded no evidence, and certainly no clear and convincing evidence, to support the story the plaintiffs laid out for this court. In fact, the story itself has changed. I believe when the court last heard from the plaintiffs, the theory was that these CDOs were somehow designed to fail and that Magnetar had dictated the selection of collateral. What we see in the reply papers before this court on this appeal is, well, there was a influence of Magnetar that should have been disclosed. The fact of the matter is, theyíve had an opportunity to examine the very emails they cited to you seven years ago, theyíve had the opportunity to take the depositions of those individuals who wrote those emails, and the fact of the matter is, their inferences and their speculation notwithstanding, the evidence, the admissible evidence that could be presented to a jury, simply does not support a claim of fraud by clear and convincing evidence on multiple elements. Iím going to address two of them in particular, but Iím happy to answer any questions the court might have. Iíll start with reliance and then turn to loss causation. Plaintiffs did not rely on any representations from the defendants, period. What they relied on, and the only thing that the plaintiffs relied on, and this is from the deposition testimony of the 30B6 witness for the plaintiffs, Mr. Shane Hollywood, and what he said is, the sole document they relied on was an investment recommendation from IKB. And that wasnít a one-page investment recommendation that said, ìIKB recommends you make this investment.î It was an IKB analysis, 12 to 14 pages, 15 pages max. But the IKB analysis did contain the information that Harding and SAI are making independent decisions, and we think they have good judgment. So if it were a misrepresentation that they were making independent decisions, that would be the misrepresentation that was passed along to the plaintiffs, would it not be? I think there are two responses to that. One, at no time did the collateral managers represent to IKB that the collateral managers would not be seeking input from other investors. In fact, IKB itself gave input to the collateral managers about the eligibility criteria. IKB itself received drafts of the offering circular and marked them up. Let me just pause there for a second. IKB was marking up drafts of the offering circulars. It certainly, if it wanted to ask questions of the collateral managers and say, ìAre you speaking to other investors?î It could have. In fact, the testimony from IKB was, ìWe had our set of issues that we wanted to discuss with the collateral managers. Iím sure others did too.î They never shared any of that with the plaintiffs. They also conducted a risk analysis of these CDOs, and Judge Crowley makes the point twice in the decision below that that risk analysis was never shared with the plaintiffs. Why is that significant? Because the risk analysis, and this is the risk analysis at the record at 1098, 1098, originally in German, translated to English, what that risk analysis noted was that there were changes in the structure of these CDOs, the Octance II CDO, that were being done at the request of equity investors. So someone else was requesting a change in how these deals were structured. IKB knew that, never shared that with the plaintiffs. And thatís why getting to the question that was asked before about what role IKB played, this fits squarely with an issue and that has been addressed, I believe not once but twice by the Court of Appeals on certified questions. What happens when the intermediary is not simply a conduit, isnít simply paraphrasing and sending along information, but instead doing its own analysis, sending along some snippets, but creating entirely new analyses, and sending entirely new analyses to the plaintiff. And thatís what we have here. What we have here, I think the phrase that was used both in SIPC by both the Second Circuit and by the Court of Appeals was, where the reports are being filtered through the intermediaryís own process of evaluation, the plaintiff cannot then claim justifiable reliance of the filtered statement or the absence thereof as representing either the sum or the substance of the defendantís representations. So the mere fact that, so the word ìindependentî is never used by the defendants. The word ìindependentî is never used by IKB. Because IKB knew that there were others who could speak to the collateral manager, who could let their views be known, and as Mr. Corpus said, these are private placement deals, and as your Honours have noted, with very, very sophisticated parties. If they want the deal to be set up a particular way, they have the ability to make that ask. So, counsel, counsel, but doesnít the New York Court of Appeals leave some room even where you have an intermediary of this sort if the intent to defraud the ultimate party is absolutely clear? So isnít, doesnít your argument have to be that here there was no such intent of that sort, of that little gap that the New York Court of Appeals has left open in the certification, that that wasnít, there wasnít evidence of that here? Two responses to that. I agree with you that the evidence wasnít here today, but I would respectfully suggest in Pasternak that the formulation you just offered, your Honour, is in fact the formulation of the dissent. What the majority found in Pasternak is, itís not enough. Even where the intent is clear, there actually has to be transmission. And that was really the point of the dissent. The point of the dissent from Judge Fahey in the where the intent is clear and thereís reliance, that should be enough. You donít need transmittal. But what the majority made very clear is youíve got to have that transmittal, and that transmittal has to be a conduit-type transmittal. It canít be a filtering or, you know, a filtering-type analysis that we just discussed. If there are no more questionsÖ Youíre saying, youíre saying that did not receive sufficient information through IKB from the collateral managers that they were going to independently vet each security, like that would be a misapprehension of the information they were receiving? All that they were told is that there were collateral managers and what the qualifications of those collateral managers were. A lot of what they were told about the collateral managers, to be clear, was an analysis done entirely by IKB. You will see in the three recommendations, and Iíll give you one example that starts at A1010, there is an extended section discussing IKBís evaluation of the metrics of the collateral manager. Thatís an analysis that they created completely themselves. It looks like a spider web, and youíll see that in the diagram. Thatís a spider web that they created. They assigned values to it. They put whatever weight they wanted to put on what the qualifications and backgrounds and abilities of these collateral managers were. Thatís what the plaintiffs relied on. They didnít rely on the disclosures that were in the offering circular, which simply said, ìThis is who the collateral manager is. The collateral manager is going to select the collateral, and these are the qualifications.î And thereís no dispute in this case, by the way, that every piece of collateral that was selected was in fact vetted by the collateral managers. What the plaintiffs are arguingÖ It sounds like youíre saying that thatís not even necessary, because they didnít receive representation that it was going to be independently vetted, and so they would have been wrong to rely on such representation. So even if they had been taking direction from Magnetar, youíre saying the plaintiffs still wouldnít have a claim? They still wouldnít have a claim. Because of what they relied on and who they relied on, they did not rely on the defendants. And IKB, the intermediary, knew that there was an equity structure, never asked who that was, never asked for the identity. IKB had direct contact with Magnetar in other contexts, knew Magnetar was investing in CDOs, in the equity tranches, and found Magnetar to be brave, but never inquired further. And this court, if youíre discussing reliance and justifiable reliance, and if itís IKB, the party that supposedly relied on the And thatís not on defendants, thatís on IKB, and the plaintiffs canít take advantage of that. Iíll pivot briefly to loss causation. While itís terse, I do believe Judge Crotty does address loss causation substantively, and the reason I believe that is because he cites basis. If all he was doing was saying, ìWell, I found no misrepresentation and no reliance, therefore, thereís no loss causation, a fortiori.î He didnít do that. He cited basis. And basis is on point for a couple of reasons. One is it deals with CDO notes. It deals with precisely the types of securities that are at issue in this case. It cites basis, cites extensively from this courtís decision in Lorelei 1, as to how do you determine whether or not, as a matter of New York law, there is loss causation in the midst of a market-wide sell-off in precisely the same types of securities that are at issue in the case before the court. And the theory of fraud and basis was analogous, not identical, was analogous to the theory of fraud thatís being suggested here, which is that the collateral manager would pick safer RMBS assets and not toxic assets. And the collateral manager in that case supposedly lied about that. And what the basis court found was, that did not make a difference. Thatís not what caused the losses to the plaintiffís investment. And the same holds true here. Even if you assume that Magnetar was influencing the selection of collateral, even if you find that thereís a question of fact as to whether Wachovia was influencing the selection of collateral, whose burden once loss causation has been pled, whose burden is it to show that it was the fraud that caused the loss as against the market loss that caused the loss in situations like this? Thatís what makes these loss causation cases interesting and rather different from the standard tort case where somebody is speeding and is therefore underneath a tree that happens to fall, but being the speeding put you under the tree, so there was but-for cause, transaction causation, but no loss causation, and itís up to because of vibrations, because one doesnít see the connection, while in a case like this, the burden may be on the other. Thatís what makes loss causation here a rather complicated issue. Did the district court make any analysis of that sort? And did the New York Court of Appeals in Mason make an analysis of the sort? The sort that was suggested, in fact, in Loreleiís one. I believe the burden of proving loss causation is squarely on the plaintiffs, and I believe in Basis, which has a more extended discussion of loss causation than the case, than the district court opinion here. In Basis, there was a discussion about what evidence the plaintiff failed to come forth with, because clearly on summary judgment, one of the things weíre assessing is, is there sufficient evidence in the record, is there an absence of evidence, in other words, that would allow a plaintiff to prove with clear and convincing evidence to a jury that there is loss causation. So the absence of evidence becomes relevant on summary judgment. That was certainly true in Basis, because there was an absence of evidence from the plaintiffs saying that the loss would not have occurred, but for the fraud, that the market forces that were wiping out all other similar investments would have somehow not operated the same way on the plaintiffís investment, that the plaintiffís investment was somehow special and different and immune from those losses. In this case, Iíll offer two answers. One is, if you follow the plaintiffís theory, which is, well, we donít need to look at what happened ex post, what happened after we made the investment, you simply should look at what happened on the date we made the investment, and if thereís a purchase price disparity, thatís enough. Wrong, wrong, and wrong. Wrong on the law, because thatís simply a measure of damages thatís recognized by New York law. What Allegheny also says is, you still have to prove that that purchase day disparity in price was caused by the fraud of which you complain. You canít get away from the obligation of making the connection to the fraud. So the plaintiffs argue, well, we have a loss. You can measure the loss by comparing what we paid versus what we think it was worth. Where is the evidence of what these notes were worth other than par on the date they made the purchase? In fact, in the complaint, they plead exactly the opposite. In the complaint they plead, we were damaged when there were defaults in the underlying collateral and the cash ceased to flow, and with the cash stopped flowing, our notes became worthless. I do not. I do not, and for several reasons. One is, in the context of securities transactions, whether or not itís under 10b-5 or under New York common law, there are many, many cases, and Basis is the most recent case which applies the concepts equally to publicly traded securities, but also non-publicly traded securities. The CDO notes in Basis were not publicly traded. And the notion is, as an investor, one thing you do look at is, whatís the purpose of the investment? In this case, the purpose of the investment was the cash flow. Cash was flowing. As long as there was cash in these CDOs, these notes performed exactly as they stated they would. The notes stopped performing. So you think that Allegheny really doesnít apply in a case of securities fraud rather than sale of a business? Allegheny by its terms doesnít apply because they start off the analysis of loss causation by noting that thereís a distinction between securities cases and the fact pattern that before the court in Allegheny. So by its terms, Allegheny says it doesnít apply in the sale of securities. So your proposition is that a difference in purchase price can never be loss causation? I donít know if Iíd go that far, and I donít know if we need to go that far to say it would never be. I think the connection is, what is the loss, what is the damage you have incurred, when did you incur it, and when you incurred that damage, was that proximately caused by the fraud of which you complained? And we know from the pleading in this case that these plaintiffs have alleged they were damaged when money stopped flowing through the notes, not on the date they made the purchase, and thereís no evidence. So whatís the evidentiary support if you embrace Allegheny? If you embrace Allegheny and say, okay, that should be the standard, it should be day of purchase disparity in price. Whatís the evidence for that? None. There was a statement made by their expert and said, are you opining that the rating agencies would have ascribed a different rating to these notes? He said, unequivocally in his deposition, Iím making no such rating opinion. Counsel, suppose they would not have bought it at that price, or would have paid less. So they bought it at the higher price, and then before the market collapses, because they learn what is going on, they sell. Would there be loss causation then? There would not. There would not. Because, and thatís the prototypical case that you encounter in the securities laws. Before the disclosure, before the truth revealing. I think youíd have some problems with that. I donít think weíve reached that, but I think youíd have some problems. I think weíd better move on. Can I ask a more basic question? I mean, so setting back to the misrepresentation, do you dispute that it would have mattered to the Lorelei plaintiffs if they had known about Magnitarís short position, or that it had known about Wachoviaís influence over SAI? Do you just think they wouldnít have made different decisions? Well, I donít know what the plaintiffs themselves would have done. We do know that they were autopilot, in the sense they got a recommendation from IKB and they accepted it. Thatís the way they operated. We know IKB certainly was aware that there were other actors with different investment strategies that were also in the same market that they were participating in. In fact, they had a report that said, you know, ìThese CDOs are far too risky. You shouldnít be investing in them.î They never shared that with the plaintiffs. So I donít know the motivations. Clearly, in hindsight, a plaintiff will always say, ìIf only I had known X, I wouldnít have made the investment.î But thereís nothing in the pattern of dealings and the questions that were asked by IKB off the defendants, the information they sought, the information they focused on, that that ultimately would have mattered. They had a view of the market that was different than Magnitarís view of the market, and IKB recommended heavy investments consistent with that view. Okay, I think we understand that. So, unless my colleagues have further questions, letís turn back to Mr. Korpis. Thank you, Mr. Tambi, but letís turn back to Mr. Korpis on rebuttal. Thank you, Yonah. On the last point, the record is clear that IKB would not have recommended the investment had they known of Magnitarís short investment, and the record is clear that the loyalist would not have purchased it had that happened. Thatís both in the depositions of IKB witnesses, Dr. Blatner, Dr. Utakubis, Thomas Schirmer, and in the declarations, and similarly in the depositions and declarations of Shane Hollywood. In fact, even defendants on witnesses said that the collateral manager is of key importance to the investors, and as I said, he was shocked when he heard about Magnitarís short position, and thatís the point here. Mr. Tambi spoke about IKB being involved in the process, asking questions, knowing that the equity investor was asking questions. The equity investor, if the pure equity investor, theyíre the bottom of the capital structure, so they are the first ones who suffered the loss, and their interest is aligned with IKB. If they had known that the equity investor was, in fact, net short, as they testified and as they put in declarations, that would have raised all kinds of red flags, and they would not have recommended it. Now, on the question of whether or not these representations were just as a conduit, this is what an email said from 2006 from IKB to numerous Rokovia personnel, including Michael Thompson, and the 36th witness, and the cell executive responsible for IKB. IKB pointed out, ìIKB is only an investment advisor to Lorelei, which means we can only make recommendations, and they will take the ultimate decision by themselves.î Thatís in the appendix at page 4066. So Rokovia knew that they are just passing the information to IKB, and IKB is going to pass it to Lorelei, who will make the ultimate decisions by themselves. They knew it was going to be filtered into a recommendation, right? I mean, it was not just going to be passed along. It depends on what you define by ìfiltered.î ìFilteredî is a bit of a loaded word, given the case law, but in this case, what weíre saying is there was an omission, an omission of the role of Magnetar. That omission cannot be filled by IKB. Well, Rokovia knew, and from what you read, IKB explained, that it would be doing its own work. It would be doing its own due diligence with whatever Rokovia submitted to IKB. But that due diligence and that own work doesnít negate passing of a misrepresentation. If Rokovia told IKB that the collateral was rated, I can think of right now an example, but if Rokovia told something thatís completely false to IKB, and IKB had no way of finding this out because IKB did not know what was going on behind the scenes, Magnetarís role was not explained, then the fact that there is its own separate analysis doesnít negate a misrepresentation and an omission that then gets passed on to the ultimate purchaser. I donít think that there is anything in the cases, in the BDO assignment case, or in the Passner case, that makes a difference in that respect. Those cases were more about the fact that the ultimate representation didnít make its way to the plaintiffs or that the plaintiffs, for example, did not see, did not rely on the NASDAQ form. This is different here. The representation that Harding and SAI would be the ones selecting, and the omission that Magnetar would not be exerting any undue influence on the collateral managers, that statement, that omission, did make it to the plaintiffs. The plaintiffsÖ So, if IKB participated in litigation and has this close relationship with Lorelei, why isnít IKB a party that says it was a victim of the misrepresentation? Is there a reason for that? Iím sorry, Anna, I missed the first part of your question. Could you repeat that? Like, might IKB have a claim against the defendants here if they received the representation directly and would have given different advice? I donít think so, because IKB wasnít a purchaser of the knowledge, so IKB didnít suffer any loss. The party that suffered loss is the Loreleiís. Right. So, if IKB is the intermediary, then maybe that creates a problem. Is that an argument about how we should think about third parties acting as a conduit? A problem for whom? Iím not sure. I think with IKBÖ I think itís getting weirder. Yeah. I think thatís right. I think the party at the end, the party that suffers the loss, is the one that can sue, and all you need to show, as the case I think is pretty clear, is that the party who made the misrepresentation knew that the information would be passed on to the ultimate purchaser, and made that representation knowing it. And thatís what Judge Calder said. Briefly addressing loss causation. Can I address loss causation quickly? Just make one final comment, and then weíre going to conclude. Okay. On loss causation, there is evidence in the record that shows the difference that was paid as of the closing. And itís not Dr. Neuberger, itís Mr. Edelson, whose opinion was deemed to be eminently admissible by Judge Crotty, and he said that there would have been a difference in the ratings had the truth been known. Dr. Neuberger then applies that to the pricing formula, and shows how that gets translated into a difference in purchase price, and thatís the two common law fraud claims. It makes a distinction between the type of lawsuit, not between whether itís security or sale of a business, otherwise there would be a difference between selling a business or selling the shares in the business, which doesnít make any sense. Thank you. Okay. Thank you very much, Mr. Korpis. The case